## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARILYN DEVAULT, Derivatively on Behalf of BRISTOW GROUP INC. <br><br> Plaintiff, <br><br> v. <br><br> THOMAS N. AMONETT, GAURDIE BANISTER JR., IAN A. GODDEN, LORI A. GOBILLOT, A. WILLIAM HIGGINS, THOMAS C. KNUDSON, BIGGS C. PORTER, JONATHAN E. BALIFF, STEPHEN A. KING, MATTHEW MASTERS, DAVID C. GOMPERT, BRUCE H. STOVER, L. DON MILLER, and BRIAN J. ALLMAN, <br><br> Defendants, <br><br> and <br><br> BRISTOW GROUP, INC., Nominal Defendant. | Case No.: <br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

## STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Marilyn DeVault ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Bristow Group, Inc. ("Bristow" or the "Company"), submits this Verified Stockholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action brought on behalf of and for the benefit of Bristow, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from February 8, 2018 to the present (the "Relevant Period").  Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to Bristow, including damages to its reputation and goodwill.

2.     Bristow is a global industrial aviation services provider.  The Company describes itself as the leading provider of helicopter services to the worldwide offshore energy industry based on the number of aircraft operated and one of two helicopter service providers to the offshore energy industry with global operations.  The Company has major transportation operations in the North Sea, Nigeria and the U.S. Gulf of Mexico, and in most of the other major offshore oil and gas producing regions of the world, including Alaska, Australia, Brazil, Russia and Trinidad.

3.     During the Relevant Period and prior to February 11, 2019, Bristow repeatedly represented to Plaintiff and the investing public that its disclosure controls and procedures were effective.

4.     On November 9, 2018, Bristow announced that it had entered into a definitive agreement to acquire privately held Columbia Helicopters, Inc. ("Columbia") for $560 million.

5.     On February 11, 2019, after the market closed, the Company filed a Form 8-K with the SEC disclosing that it "…did not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements."

6.     On this news, the Company's share price fell $1.22, or nearly 40%, to close at $1.84 per share on February 12, 2019.

7.       On February 12, 2019, the Company filed a Form 8-K with the SEC to announce: (i) that it had terminated its agreement to purchase Columbia and paid Columbia $20 million; and (ii) that Jonathan E. Baliff would retire as Chief Executive Officer and would resign from the Board of Directors, effective February 28, 2019.

8.       On this news, the Company's share price fell $0.64, or nearly 35%, to close at $1.20 per share on February 13, 2019.

9.       The misconduct has subjected the Company to multiple securities litigation and other litigation including (1) *Kokareva, v. Bristow Group, Inc., et al.*, Case: 19-cv-00509 (S.D. TX.); and (2) *Lilienfield v. Bristow Group, Inc., et al.*, Case: 19cv1064 (S.D.TX.).

10.      On May 11, 2019, Bristow and seven affiliated entities voluntarily filed for Chapter 11 bankruptcy protection.

## JURISDICTION AND VENUE

11.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

12.      This Court has jurisdiction over each defendant named herein because each defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.      Venue is proper in this Court under 28 U.S.C. Section 1391 as Bristow is a corporation incorporated in the State of Delaware.

14.    Venue is also proper in this court because Bristow's Amended and Restated By-Laws dated as of March 6, 2014, at Article 7, Section 7.7, provide:

> Exclusive Forum. Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporate Law, or (iv) any action asserting a claim governed by the internal affairs doctrine shall be a state or federal court located within the State of Delaware, in all cases subject to the court's having personal jurisdiction over the indispensable parties named as defendants.  Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice and consented to the provisions of this Section 7.7.

## THE PARTIES

### Plaintiff

15.    ***Plaintiff Marilyn DeVault*** is, and was at relevant times, a stockholder of Bristow. Plaintiff will fairly and adequately represent the interests of the stockholders in enforcing the rights of the corporation.

### The Company

16.    Bristow is a global industrial aviation services provider.  Bristow was incorporated in Delaware and maintains its principal executive offices at 2103 City West Blvd., Houston, Texas 77042.

### Director Defendants

17.    ***Defendant Thomas N. Amonett*** ("Amonett") joined Bristow's Board in February 2006.  Amonett has been executive vice chairman of Bristow's Board since February 2019.  He served as vice chairman of Bristow's Board from November 2018 to February 2019.  Amonett served as a member of Bristow's Compensation Committee from 2006 to November 2018 and

served on Bristow's Audit Committee from 2006 to 2016.  Amonett received $458,833.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

18.     ***Defendant Gaurdie Banister Jr.***  ("Banister") joined Bristow's Board in October 2017.  Banister has served as a member of Bristow's Compensation Committee since 2017.  Banister received $40,500.00 as total compensation for serving as a director of Bristow for the fiscal year 2018.

19.     ***Defendant Ian A. Godden*** ("Godden") joined Bristow's Board in January 2010. Godden has served on Bristow's Corporate Governance and Nominating Committee since 2010 and as its chair since 2016.  He has also served on Bristow's Compensation Committee since November 2018 and on Bristow's Audit Committee from 2010 to November 2018.   Godden received $445,083.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

20.     ***Defendant Lori A. Gobillot*** ("Gobillot") joined Bristow's Board in May 2012. Gobillot has served on Bristow's Compensation Committee since 2012 and as its chair since November 2018.  Gobillot has also served on Bristow's Corporate Governance and Nominating Committee since 2016.  Gobillot received $428,000.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

21.     ***Defendant A. William Higgins*** ("Higgins") joined Bristow's Board in June 2016. Higgins has served as a member of Bristow's Audit Committee since 2016 and Corporate Governance and Nominating Committee since 2017.   Higgins received $380,500.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

22.     ***Defendant Thomas C. Knudson*** ("Knudson") joined Bristow's Board in June 2004. Knudson has been chairman of Bristow's Board since 2006.  Knudson served on Bristow's

Corporate Governance and Nominating Committee from 2004 to 2016 and served on Bristow's Compensation Committee from 2004 to 2006.  He served on Bristow's Executive Committee from 2006 to 2007.  Knudson served on the Audit Committee staring February 20, 2019 and following the resignation of Defendant King.  Knudson received $740,000.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

23.  **_Defendant Biggs C. Porter_** ("Porter") joined Bristow's Board in June 2016.  Porter has served on Bristow's Audit Committee since June 2016.  Porter received $406,750.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

**Officer Defendants**

24.  **_Defendant L. Don Miller_** ("Miller") was appointed as President and Chief Executive Officer in February 2019.  He previously served as Bristow's Senior Vice President and Chief Financial Officer from August 2015 to February 2019.  Before that he served as Bristow's Senior Vice President, Mergers, Acquisitions and Integration from June 2015 to August 2015, its Vice President, Mergers, Acquisitions and Integration from November 2014 to June 2015 and its Vice President, Strategy and Structured Transactions from 2010 to 2014.  Miller received at least $3,652,534.00 as total compensation for serving as an officer of Bristow for the fiscal years 2017 and 2018.

25.  **_Defendant Brian J. Allman_** ("Allman") was appointed as Senior Vice President and Chief Financial Officer in February 2019.  He previously served as Bristow's Vice President and Chief Accounting Officer from May 2016 to February 2019.  He remained as its Chief Accounting Officer until April 2019.  Before that he served as Bristow's Vice President, Chief Accounting Officer and Controller from November 2010 to May 2016.  He joined the Company as Director of Financial Reporting in March 2006.  In August 2007 he was promoted to Corporate Controller and

was subsequently elected Chief Accounting Officer in April 2009.  Allman received at least $1,425,844.00 as total compensation for serving as an officer of Bristow for the fiscal years 2017 and 2018.

**Former Executive Officer and Director Defendants**

26.     *Defendant Jonathan E. Baliff* ("Baliff") joined the Bristow Board and was appointed as President and Chief Executive Officer in July 2014.  He joined Bristow and served as Senior Vice President and Chief Financial Officer from October 2010 to June 2014.  On November 9, 2018, Bristow announced that Baliff was retiring "in the coming months" and on February 12, 2019 Bristow announced that Baliff had retired as CEO and resigned from the Company's Board of Directors, effective February 28, 2019.  Baliff received at least $6,193,263.00 as total compensation for serving as an officer of Bristow for the fiscal years 2017 and 2018.

27.     *Defendant Stephen A. King* ("King") joined Bristow's Board in January 2011 until his retirement on February 18, 2018.   During the Relevant Period, King served as a member of Bristow's Audit Committee and was identified by Bristow as an Audit Committee Financial Expert. King and Mathew Masters, directors and executive officers of Caledonia, were designated by Caledonia for election to Bristow's Board pursuant to a Master Agreement dated December 12, 1996 among the Company, a predecessor in interest to Caledonia and certain other persons in connection with our acquisition of 49% and other substantial interests in Bristow Aviation. The Master Agreement provides that so long as Caledonia owns (1) at least 1,000,000 shares of common stock of the Company or (2) at least 49% of the total outstanding ordinary shares of Bristow Aviation, Caledonia will have the right to designate two persons for nomination to Bristow's Board and to replace any directors so nominated.  According to its Form 13F filed with the SEC on April 13, 2017, Caledonia was the direct beneficial owner of 2,848,767 shares of our common stock as of

March 31, 2017.  According to its most recent Form 13F filed with the SEC on April 12, 2018, Caledonia was no longer the direct beneficial owner of any shares of Bristow's common stock as of March 31, 2018.  King received $465,500.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018

28.    ***Defendant Matthew Masters*** ("Masters") joined Bristow's Board in November 2011 until his retirement on July 31, 2018.   During the Relevant Period, Masters served as a member of Bristow's Compensation Committee.   King and Masters, directors and executive officers of Caledonia, were designated by Caledonia for election to Bristow's Board pursuant to a Master Agreement dated December 12, 1996 among the Company, a predecessor in interest to Caledonia and certain other persons in connection with our acquisition of 49% and other substantial interests in Bristow Aviation. The Master Agreement provides that so long as Caledonia owns (1) at least 1,000,000 shares of common stock of the Company or (2) at least 49% of the total outstanding ordinary shares of Bristow Aviation, Caledonia will have the right to designate two persons for nomination to Bristow's Board and to replace any directors so nominated.  According to its Form 13F filed with the SEC on April 13, 2017, Caledonia was the direct beneficial owner of 2,848,767 shares of the Company's common stock as of March 31, 2017.  According to its most recent Form 13F filed with the SEC on April 12, 2018, Caledonia was no longer the direct beneficial owner of any shares of Bristow's common stock as of March 31, 2018.  Masters received $425,500.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

29.    ***Defendant David C. Gompert*** ("Gompert") joined Bristow's Board in February 2015 until his retirement on March 1, 2018.  As stated in Bristow's Form 8-K filed with the SEC on September 25, 2017, Gompert's stated intent to resign from the Board did not arise from any disagreement with the Company on any matter relating to the Company's operations, policies or

practices.  Gompert received $418,750.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

30.     ***Defendant Bruce H. Stover*** ("Stover") joined Bristow's Board in November 2009 until his retirement on March 1, 2018. As stated in Bristow's Form 8-K filed with the SEC on September 25, 2017, Mr. Stover's stated intent to resign from the Board did not arise from any disagreement with the Company on any matter relating to the Company's operations, policies or practices.  Mr. Stover received $423,084.00 as total compensation for serving as a director of Bristow for the fiscal years 2017 and 2018.

31.     Defendants Amonett, Banister, Godden, Gobillot, Higgins, Knudson, Porter, Baliff, King, Masters, Gompert, and Stover are referred to herein as the "Director Defendants".

32.     The Director Defendants together with Defendants Miller, and Allman are collectively referred to herein as the "Defendants".

<h2 style="text-align:center">BRISTOW'S CORPORATE GOVERNANCE</h2>

33.     As members of Bristow's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

34.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bristow, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

35.     On its website, Bristow represents:

**Governance**

Bristow believes that the foundation for its success is built upon the highest standards of safety, quality and integrity. Bristow has a culture of strict compliance with all legal and ethical guidelines applicable to its operations.

Bristow demonstrates the utmost integrity in all of its business conduct, including dealings with fellow employees, clients, intermediaries, suppliers, governments, financial record keeping and treatment of company property.

## Code of Business Integrity

36.     Bristow maintains a Code of Business Integrity ("COBI").  On its website and regarding its COBI, Bristow represents:

As part of Bristow's compliance culture, we have adopted a Code of Business Integrity. ***This code sets out the principles and behavior we must all follow*** to build and maintain an ethical culture and workplace throughout the organization.

***We must demonstrate integrity in all our business conduct***, including dealings with fellow employees, clients, intermediaries, suppliers, governments, financial record keeping and treatment of company property.
[Emphasis added]

37.     Bristow's COBI provides in relevant part:

### ACCURACY OF COMPANY RECORDS

***We must keep honest and accurate records***. Our ability to make responsible business decisions depends upon the integrity of our records. Also, our ability to make accurate representations to our shareholders, government agencies, and other outside third parties depends on compliance with this requirement. ***You should never hide, alter, falsify, or disguise the true nature of any business transaction***.

\* \* \*

Bristow files periodic reports and other documents with various regulatory authorities, including the U.S. Securities and Exchange Commission (SEC) and the New York Stock Exchange. ***Employees involved in the preparation and submission of these reports and other public disclosure must ensure that the information presented is full, fair, accurate, timely, and understandable***. Inaccurate, misleading, or dishonest financial reporting can result in civil or criminal penalties for both the Company and the employees involved.

\* \* \*

### INTERNAL FINANCIAL CONTROLS

As a publicly traded company, we are required by law to ensure that:

- All transactions, assets, and liabilities have been properly recorded on a timely basis.
- All transactions have been authorized by management and made in accordance with applicable laws and regulations.
- Company assets are adequately safeguarded.  We must also ensure that all transactions, assets, and liabilities are recorded in accordance with U.S. Generally Accepted Accounting Principles (GAAP) and, where applicable, other local or statutory principles.

*You should never structure or record any transaction, asset, liability, or reimbursement request, or engage in any other conduct, in an attempt to circumvent Bristow's system of internal controls.*

*For more information, see our Code of Ethics for Senior Financial Officers.*

\* \* \*

**FINANCIAL INTEGRITY – WHAT SHOULD I DO?**

- Know what information is a record so that you can properly report, retain, and destroy it consistent with our Records Management Policy.
- Accurately record all expenses, assets, liabilities, and revenues in a timely manner.
- Do not conceal or mischaracterize the true nature of any business transaction.
- Abide by all internal control procedures.
- Report immediately any accounting or auditing irregularities, including incidents of suspected fraud.
- Do not trade or encourage others to trade securities or derivatives based upon material, nonpublic information.
- Cooperate fully with all litigation holds and investigations.

\* \* \*

**COMMUNICATIONS AND SOCIAL MEDIA**

Remember that all oral or written communications are a reflection of Bristow. *Information conveyed in any communication should be accurate, truthful, and never misleading.*  [Emphasis added].

38.     Notwithstanding Bristow's representation that it maintains a Code of Ethics for Senior Financial Officers, no such Code appears on its website.  When conducting a search for

"Code of Ethics" on the Bristow website, it states "0 results were found for Code of Ethics" and "Sorry, Code of Ethics was not found".

**Corporate Governance Guidelines**

39.     Bristow maintains Corporate Governance Guidelines which it states were established following the recommendation of the Corporate Governance and Nominating Committee.  These Corporate Governance Guidelines state in relevant part:

**Clawback Policies**

If an employee is determined by the Compensation Committee to have violated our Code of Business Integrity, that employee may lose a portion or all of their incentive compensation as determined by the Compensation Committee on a case by case basis (the "COBI Clawback Policy". Separately, the Compensation Committee has additional discretion to recoup any portion of annual or long term incentive compensation granted in June 2017 or thereafter to any of the Company's current or former executive officers in the event the Company is required to publish a restatement to any of its previously published financial statements as a result of either (a) the material noncompliance of the Company with any applicable financial reporting requirement under the U.S. federal securities laws or (b) the fraud, theft, misappropriation, embezzlement or intentional misconduct by such current or former executive officer (the "Financial Clawback Policy"). However, any forfeiture and/or return of incentive compensation by a current or former executive officer under the Financial Clawback Policy will, in any event, be limited to any portion thereof that such current or former executive officer would not have otherwise received if the Company's consolidated financial statements had been reported properly at the time of first public release or filing with the SEC. Neither the COBI Clawback Policy, nor the Financial Clawback Policy is intended in any way to restrict the rights of the Company, the Board or the Compensation Committee to assert any claim against or seek recovery from any current or former employee of the Company.

* * *

**Corporate Strategy**

At least once each year, the Board, together with senior management, shall devote an extended meeting to discussing and providing direction for the corporate strategic plan. Throughout the year, any significant corporate strategy decision shall be brought to the Board for review and approval. At each meeting, management will update the Board on the progress of the corporate strategy and any significant changes in strategy.

**Audit Committee Charter**

40.     Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee, *inter alia*, is to "…assist Board oversight of (1) the integrity of the Company's financial statements, [and] (2) the Company's compliance with legal and regulatory requirements…"

41.     The Audit Committee Charter states in relevant part:

**Responsibilities**

The Committee assists the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, disclosure controls and procedures, internal control over financial reporting and financial reporting practices of the Company….

* * *

In discharging its oversight role, the Committee is empowered to investigate any matter relating to the Company's accounting, auditing, disclosure controls and procedures, internal control over financial reporting or financial reporting practices…

* * *

The Committee shall have the specific authority and responsibilities set forth below:

* * *

- Review the Company's audited financial statements and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discuss them with management and the independent auditor. These discussions shall: consider the quality of the Company's accounting principles as applied in its financial reporting; review particularly sensitive accounting estimates, reserves and accruals, judgmental areas, audit adjustments (whether or not recorded); and other inquiries as the Committee or the independent auditor shall deem appropriate. Based on such review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K (or the Annual Report to Shareholders, if distributed prior to the filing of the Form 10-K).

- Issue annually a report to be included in the Company's proxy statement as required by the rules of the SEC.

- Discuss with a representative of management and the independent auditor the interim financial information contained in the Company's Quarterly Report on Form 10-Q prior to its filing and the results of the review of such information by the independent auditor.

\* \* \*

- Discuss with management and the independent auditor the quality and adequacy of and compliance with the Company's disclosure controls and procedures and internal control over financial reporting.

\* \* \*

- Assist the Board in its oversight of the Company's legal and regulatory compliance by advising the Board with respect to the Company's policies and procedures relating thereto.

\* \* \*

- Perform such responsibilities as may be delegated to it pursuant to the Company's Code of Business Integrity and Code of Ethics for Senior Financial Officers, including but not limited to matters requiring possible disciplinary action referred to it by the Chairman of the Corporate Governance and Nominating Committee. The Committee shall have the sole authority to grant waivers of such Codes to a director or executive officer.

\* \* \*

- Receive and review any disclosure from the Company's CEO or CFO made in connection with the certification of the Company's quarterly and annual reports filed with the SEC of: (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

- Discuss with management, review and approve guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

**Corporate Governance and Nominating Committee Charter**

42.     Pursuant to the Corporate Governance and Nominating Committee Charter, the purpose of this committee, inter alia, is to "…(1) recommend to the Board Corporate Governance

Guidelines; (2) review the Corporate Governance Guidelines annually to ensure that they remain suitable for the needs of the Company; (3) recommend any necessary changes in the Corporate Governance Guidelines to the Board.

**Compensation Committee Charter**

43.     Pursuant to the Compensation Committee Charter, the purpose of this committee is "…discharge the Board's responsibilities relating to compensation of the Company's directors, the Company's chief executive officer (the "CEO"), and all of the Company's other executive officers" and "…for evaluating the director and executive officer compensation plans, policies and programs of the Company and in the case of executive officers, approving such plans, policies and programs."

44.     The Compensation Committee Charter states in relevant part:

**Committee Authority and Responsibilities**

* * *

The Committee shall annually review and approve corporate goals and objectives relevant to CEO compensation. The Committee shall also annually review and approve the CEO's goals and objectives, at least annually conduct an evaluation, through the Chairman of the Committee or otherwise, of the CEO's performance in light of those goals and objectives, and determine and approve the CEO's compensation levels based on this evaluation. At least annually, the Committee shall also consider evaluations conducted by the CEO of the performance of executive officers other than the CEO and determine and approve the compensation levels of such executive officers based on these evaluations and the CEO's recommendations with respect thereto. In determining the long-term incentive component of compensation, the Committee shall consider the Company's performance and relative shareholder return, the value of similar incentive awards to executive officers at comparable companies, and the awards given to the executive officers in past years. In evaluating and determining compensation of the CEO and executive officers other than the CEO, the Committee shall consider the results of the most recent shareholder advisory vote on executive compensation required by Section 14A of the Exchange Act (the "Say on Pay Vote").

The Committee shall annually review the benefit plans covering executive officers and other employees of the Company. This review should include all plans including annual cash incentive plans, stock and long-term incentive plans, pension, retirement, and health and welfare plans (qualified and non-qualified), and other deferred

compensation plans to the extent they affect executive officer compensation. The Committee shall consider the market competitiveness of such plans, assess their inherent risks and incentive structures and recommend to the Board the design, administration, and funding of all such plans. In reviewing and making recommendations regarding incentive compensation plans and equity-based plans, including whether to adopt, amend or terminate any such plans, the Committee shall consider the results of the most recent Say on Pay Vote. The Committee shall review annually the composition of, and investment performance of, assets funding the Company's employee benefit plans. Day-to-day administration of the plans shall be delegated to management, who will make periodic reports to the Committee regarding the status of such plans. The Benefits and Retirement Plan Committee is authorized to make minor amendments to retirement, pension and health and welfare plans to the extent such amendments do not materially affect or discriminate in favor of executive officers.

* * *

The Committee shall review and approve, for the CEO and all executive officers of the Company, (a) the annual base salary level, (b) the annual incentive opportunity level, (c) the long-term incentive opportunity level, (d) employment agreements, severance arrangements, and change in control agreements/provisions, in each case as, when and if appropriate, and (e) any special or supplemental benefits (including, without limitation, perquisites).

* * *

The Committee shall annually review and make recommendations to the full Board with respect to the compensation and benefits of Directors, including under any incentive compensation plans and equity-based plans.

45.     Notwithstanding Bristow's Clawback Policy and the Compensation Committee's responsibilities relating to this policy as described in its Corporate Governance Guidelines, the Company's Compensation Committee Charter is silent regarding this or any Clawback Policy.

## **DUTIES OF DEFENDANTS**

46.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Bristow, Defendants owed Bristow and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage Bristow in an honest and lawful

manner.  Defendants were and are required to act in furtherance of the best interests of Bristow and its investors.

47.      Each director of the Company owes to Bristow and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

48.      To discharge their duties, the officers and directors of Bristow were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Bristow were required to, among other things:

(a)      Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)      Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      Remain informed as to how Bristow conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities

laws;

(d)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(e)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

49.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bristow, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     During all times relevant hereto, Defendants, collectively and individually, initiated or allowed a course of conduct by omission and commission that was designed to and did mislead the investing public, including stockholders of Bristow, regarding the valuation of its goodwill, its

business and business prospects discussed herein. In furtherance of this plan, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

52.     Defendants engaged in a common enterprise and/or common course of conduct. During this time, Defendants caused the Company to issue false and/or misleading press releases and other public filings as alleged herein.

53.     The purpose and effect of Defendants' common enterprise and/or common course of conduct was, among other things, to not reveal Defendants' violations of law and breaches of fiduciary duty, and to not reveal adverse information concerning the Company's operations, financial condition, and future business prospects.

54.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

55.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of their own overall contribution to and furtherance of the wrongdoing.

## **MATERIALLY FALSE AND MISLEADING STATEMENTS**

### **Background**

56.     Bristow is a global industrial aviation services provider.  The Company describes itself as the leading provider of helicopter services to the worldwide offshore energy industry based

on the number of aircraft operated and one of two helicopter service providers to the offshore energy industry with global operations.  The Company has major transportation operations in the North Sea, Nigeria and the U.S. Gulf of Mexico, and in most of the other major offshore oil and gas producing regions of the world, including Alaska, Australia, Brazil, Russia and Trinidad.

57.     For its financial reporting filed with the SEC, Bristow's fiscal year ("FY") ends on March 31.   Based on this fiscal year, Bristow's quarterly periods are as follows:

| Quarter | Time Period |
|---|---|
| 1st quarter | April 1 - June 30 |
| 2nd quarter | July 1 - September 30 |
| 3rd quarter | October 1 - December 31 |
| 4th quarter | January 1 – March 31 |

## MATERIALLY FALSE AND MISLEADING STATEMENTS

58.     On February 8, 2018, Bristow filed its quarterly report on Form 10-Q with the SEC for the period ended December 31, 2017, which was signed by Defendants Miller and Allman and certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Baliff and Miller.

59.     In this Form 10-Q and under Management's Discussion and Analysis of Financial Condition and Results of Operations, Bristow described its strategy as follows:

Our goal is to strengthen our position as the leading industrial aviation services provider to the offshore energy industry and a leading industrial aviation services provider for civilian SAR and to pursue additional business opportunities that leverage our strengths in these markets.  Our vision is to be a safe, financially strong, diversified global leader, succeeding no matter how challenging market conditions may be.  To achieve this goal and vision, we intend to employ our "STRIVE" strategy as follows:

- *Sustain Target Zero Safety Culture*. Safety will always be our number one focus. The best approach to be Target Zero is to continuously improve our safety systems and processes to allow us to become even safer and to build confidence in our industry and among our regulators with respect to the safety of helicopter transportation globally.
- *Train and Develop our People*. We continue to invest in employee training to ensure that we have the best workforce in the industry.  We believe that the skills, talent and dedication of our employees are our most important assets,

and we plan to continue to invest in them, especially in entry level learning, the continued control and ownership of our training assets, and creation of leadership programming.

- *Renew Commercial Strategy and Operational Excellence.* We are in the process of renewing both our commercial strategy to improve revenue productivity across our global markets and our operational strategy to serve our clients safely, reliably and efficiently. We believe that we need to renew these strategies in order to thrive in an economy that is undergoing long-term structural change.

- *Improve Balance Sheet and Return on Capital.* ***We seek to continue to improve our balance sheet and liquidity and reduce our capital costs, with a goal of debt reduction and profitability.   To achieve this we have historically practiced the principal of prudent balance sheet management and have proactively managed our liquidity position with cash flows from operations, as well as external financings***.  These external financings have included the use of operating leases for a target of approximately 35% of our LACE. The target recognizes that we will have variability above or below the target of approximately 5% of our LACE due to timing of leases, purchases, disposals and lease terminations. As of December 31, 2017, commercial helicopters under operating leases accounted for 40% of our LACE. See "Liquidity and Capital Resources — Financial Condition and Sources of Liquidity" included elsewhere in this Quarterly Report for further discussion of our capital structure and liquidity

- *Value Added Acquisitions and Divestitures.* We intend to pursue value-added acquisitions that not just make us bigger but better; that improve our competitive posture to thrive in an economy that is undergoing long-term structural change. We may also divest of portions of our business or assets to narrow our product lines and reduce our operational footprint to reduce leverage and improve return on capital.

- *Execute on Bristow Transformation.* We intend to sustain our strategy and the effective transformation of our business by focusing on execution globally.

*Fiscal year 2018 STRIVE priorities* — During fiscal year 2018, we are employing the following priorities in furtherance of the STRIVE strategy: (1) maintaining safety as our first priority; (2) achieving cost efficiencies, including the reduction of corporate general and administrative expenses to approximately 12% of revenues, while also implementing lean processes and improving productivity; (3) utilizing portfolio and fleet optimization, combined with pursuing original equipment manufacturers ("OEM") cost recoveries and capital expenditure reduction to improve liquidity and reduce debt; and (4) achieving revenue growth through contract wins in our primary geographical hubs with a focus on delivering greater efficiencies to our core oil and gas clients.  [Emphasis added].

60.     In this Form 10-Q, Bristow included its representations regarding Controls and

Procedures, stating:

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision of and with the participation of our management, including Jonathan E. Baliff, our Chief Executive Officer ("CEO"), and L. Don Miller, our Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of December 31, 2017. ***Based on that evaluation, our CEO and CFO concluded that such disclosure controls and procedures were effective*** to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to our management as appropriate to allow for timely decisions regarding required disclosure under the Exchange Act.  [Emphasis added].

61.     In this Form 10-Q and regarding Risk Factors, Bristow stated: "There have been no material changes during the three and nine months ended December 31, 2017 in our "Risk Factors" as discussed in the fiscal year 2017 Annual Report."  An identified risk in the 2017 Annual Report is identical to the risk described in Bristow's 2018 Form 10-K (regarding failure to comply with covenants contained in certain of our lease agreements) and discussed below.

62.     On May 23, 2018, Bristow filed its annual report on Form 10-K with the SEC for the period and fiscal year ended March 31, 2018 (the "2018 10-K"), which was signed by Defendants Miller, Baliff, and Allman (and certain listed defendants) and certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Baliff and Miller.

63.     The 2018 10-K on behalf of the Company stated, in relevant part:

***Failure to comply with covenants contained in certain of our lease agreements could limit our ability to maintain our leased aircraft fleet and could adversely affect our business.***

We have a significant amount of fixed obligations related to operating leases, including aircraft leases. The terms of our aircraft lease agreements contain covenants that impose certain limitations on us. Such lease agreements limit, among other things, our ability to utilize aircraft in certain jurisdictions and/or to sublease aircraft and may contain restrictions upon a change of control. A breach of lease covenants could result in an obligation to repay amounts outstanding under the lease, including rent. A breach of lease covenants with respect to the return of aircraft to

our lessors could also result in an obligation to pay holdover rent beyond the scheduled lease expiration date for such aircraft and/or increased maintenance and repair costs. If any such event occurs, we may not be able to pay all amounts due under the leases or to refinance such leases on terms satisfactory to us or at all, which could have a material adverse effect on our business, financial condition and results of operations.

64.     In this 2018 10-K, Bristow included its representations regarding Controls and Procedures, stating:

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

We carried out an evaluation, under the supervision of and with the participation of our management, including Jonathan E. Baliff, our Chief Executive Officer ("CEO"), and L. Don Miller, our Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of March 31, 2018. ***Based on that evaluation, our CEO and CFO concluded that such disclosure controls and procedures were effective*** to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms and such information is accumulated and communicated to our management as appropriate to allow for timely decisions regarding required disclosure under the Exchange Act.

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Our management is responsible for establishing and maintaining adequate internal control over our financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or because the degree of compliance with policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an assessment of the effectiveness of our internal control over financial reporting as of March 31, 2018. The assessment was based on criteria established in the framework Internal Control – Integrated Framework, issued

by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on this assessment, ***management concluded that our internal control over financial reporting was effective as of March 31, 2018***.

The effectiveness of the Company's internal control over financial reporting as of March 31, 2018 has been audited by KPMG LLP, an independent registered public accounting firm, as stated in its report included herein.

**MATERIAL CHANGES IN INTERNAL CONTROL**

There have been no changes in our internal control over financial reporting during the quarter ended March 31, 2018 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.  [Emphasis added]

65.     On June 21, 2018, Bristow filed its Form DEF 14A with the SEC (the "2018 Proxy") announcing the Company's annual meeting of stockholders on July 31, 2018.  The purpose of this annual meeting was to: (i) Elect as directors the nominees named in this proxy to serve until the next Annual Meeting; (ii) Approve on an advisory basis the Company's executive compensation; (iii) Approve the removal of common stock issuance restrictions of the Company upon the exercise of warrants; and (iv) Approve and ratify the selection of KPMG LLP ("KPMG") as the Company's independent auditors for the fiscal year ending March 31, 2019.

66.     In this 2018 Proxy, Bristow requested that each stockholder review its 2018 10-K stating:

This summary highlights certain information contained elsewhere in this proxy statement. This summary does not contain all of the information that you may wish to consider prior to voting. Please review the entire proxy statement and the Company's Annual Report on Form 10-K for more detailed information.

67.     In this 2018 Proxy, Bristow discussed its risk oversight, stating:

***The Company has historically placed a high level of importance on addressing, preempting and managing those matters that may present a significant risk to the Company***. Our Board has oversight responsibility of the processes established to report and monitor material risks applicable to us. Our Board has delegated to management the responsibility to manage risk and bring to the attention of our Board the most material risks to our Company. ***The Company has robust internal***

*enterprise risk management and executive and Board succession processes and a strong internal control environment to identify and manage risks and to communicate with our Board about these risks*. Additionally, our Board has established financial guidelines concerning liquidity, coverage and leverage intended to allow the Company to maintain a strong balance sheet and financial flexibility in all market conditions while avoiding excessive financial risk. Our Board is updated regularly on relevant matters, including, but not limited to, cybersecurity, compliance with the financial guidelines and covenants, tax and accounting matters, litigation status, compliance with governmental regulations, quality controls, safety performance, strategic and operational and financial issues. Our Board frequently discusses these matters in detail in order to adequately assess and determine the Company's potential vulnerability and consider appropriate risk management strategies and mitigating controls where necessary.

In accordance with the charter of the Audit Committee, the Audit Committee meets periodically with management to review our major financial risk exposures and the steps management has taken to monitor and control such exposures. The Audit Committee reports to our Board at each regularly scheduled meeting. Our Board also regularly meets separately with the Company's independent auditors and internal auditors in executive session outside the presence of management.  [Emphasis added]

68.      In this 2018 Proxy, Bristow recommended and requested that each stockholder, after reading the 2018 Proxy and 2018 10-K, that he or she (1) vote FOR the election to its Board of the Director Defendants and Defendants Baliff and King; (2) approve, on an advisory basis, the compensation of the Company's Named Executive Officers by voting FOR the approval of the resolution as stated in the 2018 Proxy; (3) approve the removal of common stock issuance restrictions of the Company upon exchange of warrants; and (4) approve and ratify the selection of KPMG LLP as the Company's independent auditors for fiscal year 2019.

69.      In this 2018, Proxy Bristow stated that Defendant Masters had decided not to stand for reelection to its Board and that the Board adopted a resolution fixing the size of its Board at nine directors, effective upon the completion of Masters' term on the day of the Annual Meeting.

70.      On August 2, 2018, Bristow filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018, which was signed by Defendants Miller and Allman and certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Baliff and Miller.

71.     In this Form 10-Q and under Management's Discussion and Analysis of Financial Condition and Results of Operations, Bristow described its strategy as follows:

Our goal is to further strengthen our position as the leading industrial aviation services provider to the offshore energy industry and public and private sector SAR. To do this, we will pursue efficiencies and new opportunities in our core markets, address oversupply and market saturation by diversifying our portfolio, and drive innovation throughout our businesses and industry.

We will continue to transform our business to create financial sustainability, defined as positive cash flow, reduced leverage and an ability to refinance fiscal year 2023 debt maturities in absence of an offshore market recovery as the timing of a recovery remains uncertain. Fiscal year 2019 priorities include: (1) safety improvements with a refresh of Target Zero; (2) revenue growth by being competitive in a short-cycle market; (3) cost efficiencies building on the success of fiscal year 2018; (4) improving financial returns on capital with improved aircraft utilization.

While we are well-positioned to take advantage of the beginning of an offshore investment cycle, continued innovation and greater cost efficiencies will be required beyond fiscal year 2019 as we move from sustainability to profitability. Specifically, we will continue to employ our "STRIVE" strategy as follows:

- *Sustain Target Zero Safety Culture*. Safety will always be our number one focus. We continue to deliver Target Zero performance with regard to our air accidents and a ground recordable injury rate that places us in the upper tier of our peer companies in oilfield services and aviation. We seek to continuously improve our safety systems and processes to allow us to become even safer and to build confidence in our industry and among our regulators with respect to the safety of helicopter transportation globally. We recently completed a global survey of safety culture and organizational effectiveness with our employees reporting that despite the historic industry downturn for oil and gas, our Target Zero safety culture remains intact and strong, especially at the local base level.

- *Train and Develop our People*. We continue to invest in employee training to ensure that we have the best workforce in the industry. We believe that the skills, talent and dedication of our employees are our most important assets, and we plan to continue to invest in them, especially in entry level learning, the continued control and ownership of certain training assets, and creation of leadership programming.

- *Renew Commercial Strategy and Operational Excellence*. We are in the process of renewing both our commercial strategy to improve revenue productivity across our global markets and our operational strategy to serve our customers safely, reliably and efficiently. We believe that we need to renew these strategies in order to thrive in an economy that is undergoing long-term structural change. Our Europe and Americas hub structure has

allowed us to achieve reductions in general and administrative expenses down to approximately 12% of revenue compared to 14% in fiscal year 2015. Further, our hub structure allows us to take advantage of short-cycle work, which we define as short-term demand requests from our oil and gas customers for contracts measured in months rather than years. Our ability to service this demand led to significant outperformance versus internal expectations across many of our regions during fiscal year 2018.

- *Improve Balance Sheet and Return on Capital*. We continually seek to improve our balance sheet and liquidity and reduce our capital costs, with a goal of reduced financing leverage (including lower levels of debt and leases), return to profitability and improvement of return on invested capital. ***To achieve this we have historically practiced the principal of prudent balance sheet management*** and have proactively managed our liquidity position with cash flows from operations, as well as external financings. These external financings have included the use of operating leases for a target of approximately 35% of our LACE. The target recognizes that we will have variability above or below the target of approximately 5% of our LACE due to timing of leases, purchases, disposals and lease terminations. As of June 30, 2018, commercial helicopters under operating leases accounted for 39% of our LACE. See "Liquidity and Capital Resources — Financial Condition and Sources of Liquidity" included elsewhere in this Quarterly Report for further discussion of our capital structure and liquidity.

- *Value Added Acquisitions and Divestitures*. We intend to pursue value-added acquisitions that not just make us bigger but better; that generate cost efficiencies that position us to thrive in an economy that is undergoing long-term structural change. We may also divest portions of our business or assets to narrow our product lines and reduce our operational footprint to reduce leverage and improve return on capital. We also intend to continue to utilize portfolio and fleet optimization. Consistent with our ongoing process to rationalize and simplify our business and global aircraft fleet, we sold 11 aircraft for proceeds of $48.3 million during fiscal year 2018 and sold three aircraft during the Current Quarter for proceeds of $8.1 million, of which $7.4 million was received in the Current Quarter and $0.7 million was received in July 2018. We currently have 10 aircraft held for sale and the average age of our fleet is approximately ten years. Additionally, our critical short and long-term goal is to significantly reduce our aircraft rent expense. During fiscal year 2018 and the Current Quarter, we returned four Airbus H225s and six Sikorsky S-92s to lessors. We intend to further reduce aircraft rent expense through lease returns as part of our ongoing strategy to return to profitability.

- *Execute on Bristow Transformation*. Our Europe and Americas hub structure has allowed for global alignment with faster local market response and increased cost efficiency. Also, as discussed elsewhere in this Quarterly Report, we reached agreements with OEMs during fiscal year 2018 to achieve $136 million in recoveries. [Emphasis added].

72.     In this Form 10-Q, Bristow included its representations regarding Controls and Procedures, stating:

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision of and with the participation of our management, including Jonathan E. Baliff, our Chief Executive Officer ("CEO"), and L. Don Miller, our Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of June 30, 2018. Based on that evaluation, our CEO and CFO concluded that such disclosure controls and procedures were effective to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to our management as appropriate to allow for timely decisions regarding required disclosure under the Exchange Act.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting during the quarter ended June 30, 2018 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

73.     In this Form 10-Q and regarding Risk Factors, Bristow stated: "There have been no material changes during the three months ended June 30, 2018 in our "Risk Factors" as discussed in the fiscal year 2018 Annual Report."

74.     On November 9, 2018, Bristow filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018, which was signed by Defendants Miller and Allman and certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Baliff and Miller.

75.     In this Form 10-Q and in a separate Form 8-K filed on the same date, Bristow announced that it had entered into a definitive agreement to acquire privately held Columbia Helicopters, Inc. for $560 million.

76.     In this Form 10-Q and under Management's Discussion and Analysis of Financial Condition and Results of Operations, Bristow described its strategy in substantially similar language

it used in its Form 10-Q for the period ended June 30, 2018 and filed with the SEC on August 2,

2018, and specifically including its language under "*Improve Balance Sheet and Return on Capital.*"

77.     In this Form 10-Q, Bristow included its representations regarding Controls and

Procedures, stating:

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision of and with the participation of
our management, including Jonathan E. Baliff, our Chief Executive Officer ("CEO"),
and L. Don Miller, our Chief Financial Officer ("CFO"), of the effectiveness of the
Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the
Exchange Act) as of September 30, 2018. Based on that evaluation, our CEO and
CFO concluded that such disclosure controls and procedures were effective to ensure
that information required to be disclosed in our periodic reports filed under the
Exchange Act is recorded, processed, summarized and reported within the time
periods specified by the Securities and Exchange Commission's rules and forms and
such information is accumulated and communicated to our management as
appropriate to allow for timely decisions regarding required disclosure under the
Exchange Act.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting during
the quarter ended September 30, 2018 that have materially affected or are reasonably
likely to materially affect our internal control over financial reporting.

78.     In this Form 10-Q and regarding Risk Factors, Bristow stated, "There have been no

material changes during the three and six months ended September 30, 2018 in our "Risk Factors" as

discussed in the fiscal year 2018 Annual Report other than..." and then discusses new risk factors

associated with its announced Columbia acquisition.

79.     Also, on November 9, 2018 (the same date Bristow published its Form 10-Q and

announced the Columbia acquisition), Bristow published a press release announcing that Defendant

Baliff was retiring as Bristow's CEO and director "...in the coming months".  The press release

states in relevant part:

**Jonathan Baliff to Retire from the Company Following Columbia
Helicopters, Inc. Acquisition Close
Thomas Amonett Appointed Interim President; Will Oversee Operations
During CEO Transition Process**

HOUSTON, Nov. 9, 2018 /PRNewswire/ -- Bristow Group Inc. (NYSE: BRS), the leading provider of global industrial aviation services, today announced the upcoming retirement of Jonathan E. Baliff, Chief Executive Officer of Bristow Group, in the coming months. Thomas N. Amonett, Vice-Chairman of the Board of Directors of Bristow, has been appointed to serve as the interim President of the Company during the CEO transition process. The Corporate Governance and Nominating Committee of the Board of Directors is leading the search for a new CEO, with input from the Board of Directors and the support of an executive search firm.

Until Mr. Baliff's retirement, he will focus on integration planning for the Columbia Helicopters, Inc. ("Columbia") acquisition, which was announced by the Company in a separate press release this morning. Mr. Baliff will resign from the Board of Directors concurrently with the effectiveness of his retirement.

The senior management of the Company will report directly to Mr. Amonett, who will work closely with Thomas C. Knudson, Chairman of the Board of Directors, to oversee operations. Mr. Baliff will continue to report to the Board of Directors.

Thomas Knudson stated, "On behalf of the entire company, I want to thank Jonathan for his contributions over the past eight years, including his advancement of our long-term strategy to diversify and expand our capabilities for existing and new customers. During Jonathan's tenure, we positioned Bristow to become the world's premier, diversified industrial aviation services company, and I am confident Tom's substantial operational and leadership expertise will allow him to skillfully guide the team as we embark on this next phase of growth. While we are now a more effective, efficient organization, we still have significant work to do to reduce costs and improve our financial position. The Columbia acquisition will strengthen our financial position, broaden our industrial aviation capabilities, and continue to diversify and expand our fleet and customer base."

Thomas Amonett commented, "I look forward to collaborating closely with Tom, senior management and the rest of our talented team to continue to enhance our operations, improve capital returns, and deliver the best and safest service in the industry."

Jonathan Baliff stated, "I am honored to have led Bristow, and I am proud of what our teams have accomplished since 2010, including improving our Target Zero safety culture, strengthening our capital allocation and operational processes and diversifying our aviation services. I believe the Company is well positioned to seize opportunities in the growing market for industrial aviation. I am committed to

executing a smooth leadership transition, and I look forward to serving as a representative of Bristow on the Columbia Board of Directors."

80.     On November 15, 2018, Bristow filed a Form 8-K with the SEC relating to the announced retirement of Defendant Baliff.

81.     The statements above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Director Defendants failed to disclose to investors: (i) that Bristow did not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements; (ii) based thereon, the Company could not reasonably assure compliance with certain non-financial covenants; (iii) that, as a result, the Company was reasonably likely to breach certain agreements without receiving waivers for their breaches; (iv) certain of Bristow's debt balances should be reclassified from long-term to short-term; (v) the required corrections would materially impact financial statements; (vi) the control deficiency identified represents a "material weakness" in internal controls over financial reporting; and (vii) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

82.     On February 11, 2019, after the market closed, Bristow disclosed that management had identified a material weakness in its internal controls over financial reporting.  In a Form 8-K filed with the SEC, Bristow stated in relevant part:

> In connection with the preparation of annual and quarterly financial statements, the Company's management is responsible for evaluating its disclosure controls and procedures, which are established to ensure that material information relating to the Company and its consolidated subsidiaries is made known to the officers who certify the Company's financial reports. This evaluation includes an assessment of the Company's internal controls over financial reporting, which are designed to provide reasonable assurance regarding the reliability of the Company's financial reporting

and the preparation of the Company's financial statements.  In connection with the audit of fiscal year-end financial statements, the Company's independent registered public accounting firm, KPMG LLP ("KPMG"), is responsible for auditing both (i) the financial statements to obtain reasonable assurance about whether they are free of material misstatement, and (ii) the effectiveness of the Company's internal control over financial reporting.

As part of management's assessment of the Company's internal controls over financial reporting as of December 31, 2018, a control deficiency was identified by the Company related to the Company's processes for monitoring compliance with certain non-financial covenants in certain of the Company's secured financing and lease agreements….

*Management has concluded that the Company did not have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements, and this control deficiency identified represents a "material weakness" in internal controls over financial reporting. Accordingly, the Company's internal control over financial reporting was ineffective at March 31, 2018 and the reporting periods thereafter*. As such, both management's assessment and the report of KPMG on internal control over financial reporting as of March 31, 2018 should no longer be relied upon. In addition, because of the material weakness described above, in February 2019, the Company's management has determined that the Company's disclosure controls and procedures were not effective at a reasonable assurance level as of March 31, 2018 and the reporting periods thereafter.

The Company is evaluating whether this material weakness in internal controls over financial reporting resulted in a misstatement in the Company's financial statements included in the Annual Report on Form 10-K for the fiscal year ended March 31, 2018 and the impact on the financial statements of the Company as of December 31, 2018, including disclosures. *The Company is specifically evaluating whether certain debt balances should be reclassified from long-term to short-term in those financial statements, whether related waivers can be obtained from lenders, if necessary, and the resulting impact on the assessment of the Company's ability to continue as a going concern*.

Further discussion of the material weakness and any financial statement implications, including any related revisions to the Company's previously issued financial statements, if required, will be included in the Quarterly Report on Form 10-Q for the three months ended December 31, 2018 and in an amendment to the Annual Report on Form 10-K for the fiscal year ended March 31, 2018.

As a result of matters disclosed above, the Company is unable to file its Quarterly Report on Form 10-Q for the three months ended December 31, 2018 within the prescribed time period without unreasonable effort or expense.  The Company has filed a Form 12b-25 Notification of Late Filing with the SEC, postponing the filing

of its Quarterly Report on Form 10-Q for the three months ended December 31, 2018 for up to 5 days. The Company intends to file the Form 10-Q no later than February 19, 2019, the first business day following such 5-day period.  [Emphasis added]

83.     On this news, the Company's share price fell $1.22, or nearly 40%, to close at $1.84 per share on February 12, 2019.

84.     On February 12, 2019, Bristow filed a Form 8-K with the SEC announcing that it had terminated its agreement to purchase Columbia and that it had paid $20 million to Columbia in exchange for a release of claims associated with the purchase agreement and/or its termination.  This Form 8-K states in relevant part:

> As previously announced, on November 9, 2018, Bristow Group Inc. (the "Company") and Bear Acquisition I, LLC, a Delaware limited liability company and a wholly owned, bankruptcy remote subsidiary of the Company, entered into a Stock Purchase Agreement (the "Purchase Agreement") with Columbia Helicopters, Inc., an Oregon corporation ("Columbia"), the persons listed on Schedule 1 to the Purchase Agreement and a shareholder representative. On February 11, 2019, *the parties to the Purchase Agreement entered into a termination agreement (the "Termination Agreement") pursuant to which the Parties mutually agreed to terminate the Purchase Agreement. Concurrently with the entry into the Termination Agreement, the Company has paid $20 million to Columbia, and the Company, Columbia and Columbia's shareholders have agreed to a release of claims in connection with the Purchase Agreement and the related transactions*. [Emphasis added]

85.     Also, on February 12, 2019 and in the same Form 8-K Bristow also announced that Defendant Baliff had retired as CEO and resigned from the Company's Board, effective February 28, 2019.  This Form 8-K also stated that on February 11, 2019, Bristow and Defendant Baliff entered into a Retirement and Consulting Agreement where Defendant Baliff will provide consulting services to the Company through June 30, 2019 and will receive a monthly consulting fee of $30,000.00.  Pursuant to the terms of the Retirement and Consulting Agreement, in addition to the $30,000.00 monthly consulting fee and Company payment of his COBRA benefits for 36 months, Defendant Baliff also received or will receive:

(a)     Severance payment -- a lump sum cash payment of $1,442,000;

(b)     Annual bonus -- a lump sum cash payment in satisfaction of the annual bonus with respect to the Company's fiscal year ending March 31, 2019, equal to the product obtained by multiplying (a) $721,000 by (b) a fraction (i) the numerator of which is the number of days from and including April 1, 2018 through the Resignation Date, and (ii) the denominator of which is 365;

(c)     Restricted Stock Units and Options -- all outstanding Company restricted stock units and options to purchase shares of Company stock, in each case that were granted prior to June 12, 2017 and certain other identified options and RSU's scheduled to vest in 2019-2021;

(d)     Performance Cash Awards -- any unvested performance cash awards that were granted prior to June 12, 2017, based on the achievement of target performance; and

(e)     Other enumerated benefits.

86.     On this news, Bristow's share price fell $0.64, or nearly 35%, to close at $1.20 per share on February 13, 2019.

87.     On February 19, 2019, the Company filed a Form 8-K with the SEC announcing the resignation of Defendant King from Bristow's Board.  This Form 8-K states in relevant part:

> Effective February 18, 2019, Stephen A. King resigned as a director of Bristow Group Inc. (the "Company").  ***Mr. King's resignation from the Company's Board of Directors (the "Board") did not result from any disagreement with the Company on any matter relating to its operations, policies or practices***.  Mr. King has informed the Company that he intends to continue to serve as the Chairman of the Board of Directors of Bristow Aviation Holdings Limited for a limited period until his successor can be appointed. ***The Board intends to reduce the size of the Board to eliminate the vacancy created by Mr. King's resignation***.  [Emphasis added]

88.     On February 20, 2019, Bristow filed a Form 8-K with the SEC announcing that on that date the NYSE notified Bristow that it is not in compliance with Section 802.01E of the NYSE Listed Company Manual as a result of its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2018.

89.     On March 1, 2019, Bristow filed a Form 8-K with the SEC announcing that Defendant Miller was appointed to succeed Defendant Baliff as Bristow's president and CEO effective February 28, 2019.  Bristow also announced that Defendant Allman was appointed to succeed Defendant Miller as Senior Vice President and Chief Financial Officer.

90.     On April 15, 2019, Bristow filed a Form 8-K with the SEC announcing an update on the timing of filing of its Quarterly Report on Form 10-Q for the quarter ended December 31, 2018, stating it would be filed "as soon as possible."  This Form 8-K also provided a status on waiver of defaults and provided a Risk Factor update to supplement its 2018 10-K and Form 10-Q for the quarter ended September 30, 2018.  As stated in this Form 8-K, these new Risk Factors include:

(a)     We may not be successful in complying with the covenants contained in our debt instruments and lease agreements, and any such failure to comply could result in defaults under such commitments. If we are unable to obtain waivers of any such defaults, we could be required to repay our debt obligations or contractual commitments earlier than anticipated, and there is no assurance that we would have sufficient cash available to fund such payments;

(b)     We have identified a material weakness in our internal control over financial reporting, which could, if not remediated, adversely affect our ability to report our financial condition and results of operations in a timely and accurate manner, investor confidence in our company and the value of our common stock;

(c)     We have engaged financial and legal advisors to assist us in, among other things, analyzing various strategic financial alternatives to address our liquidity and capital structure, including strategic financial alternatives to restructure our indebtedness. We and certain of our subsidiaries may elect to implement such a transaction through Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in order to obtain court approval of such transactions and to facilitate the stakeholder approvals necessary to implement such transactions; and

(d)     Our common stock could be delisted or be suspended from trading.

91.     On this news, Bristow's share price fell $0.45 to close at $0.62 per share on April 16, 2019.

92.     On May 7, 2019, Bristow filed a Form 8-K with the SEC announcing that on May 1, 2019 it was notified by the NYSE hat the average closing price of the Company's common stock, over a prior 30 consecutive trading day period was below $1.00 per share, which is the minimum average closing price per share required to maintain listing on the NYSE.

93.     In this same Form 8-K, Bristow announced that it enhanced its compensation incentive plans by (i) changing the payment schedule from annual to quarterly installments in order to incentivize consistent quarterly and annual performance and retention, and (ii) implementing cash retention awards for certain employees, including Defendants Miller and Allman.  The target award for Miller is $941,667 and the for Allman is $250,000.  Defendants Miller and Allman each received retention payments on May 3, 2019 in the amounts of $945,000 and $400,000, respectively. Regarding these retention awards, the Form 8-K states in relevant part:

> In addition to the adoption of the Incentive Plan, ***the Company entered into a retention award letter agreement***, effective as of May 1, 2019 (each, a "Retention Agreement"), ***with nine (9) employees***, including with each NEO listed below. The retention payments were made on May 3, 2019.

Under the terms of each Retention Agreement, in the event a recipient of a retention payment voluntarily terminates his or her employment, or the Company terminates such recipient's employment for Cause (as defined in each Retention Agreement), in either case before May 3, 2020 (the "Retention Date"), then such recipient will be required to repay to the Company, within 30 days following such termination, an amount equal to the retention payment reduced by taxes the Company actually withholds therefrom. *A recipient will not be required to repay the retention payment in the event of termination of employment* due to death or disability or by the Company *without Cau*se prior to the Retention Date.  [Emphasis added]

94.  In this same Form 8-K Bristow provided an update on the status of its periodic reports.

95.  On this news, Bristow's share price fell $0.02 to close at $0.37 per share on May 8, 2019.

96.  On May 11, 2019, Bristow published a press release announcing that the Company had voluntarily filed for Chapter 11 protection in the U.S. Bankruptcy Court for the Southern District of Texas.  This announcement was followed by a Form 8-K filed on May 13, 2019.   This filing was on behalf of the Company and its subsidiaries BHNA Holdings Inc., Bristow Alaska Inc., Bristow Helicopters Inc., Bristow U.S. Leasing LLC, Bristow U.S. LLC, BriLog Leasing Ltd. and Bristow Equipment Leasing Ltd.

97.  On May 15, 2019, Bristow filed a Form 8-K with the SEC announcing that on May 13, 2019 it was notified by the NYSE that the NYSE determined to commence proceedings to delist the Company's common stock from the NYSE as a result of the Company's May 11, 2019 announcement that it and certain of its subsidiaries had filed for Chapter 11 protection in the United States Bankruptcy Court for the Southern District of Texas.  The NYSE suspended trading in the Common Stock prior to the market open on the NYSE on May 13, 2019.  In addition, the NYSE advised the Company that its application to the SEC to delist the Common Stock is pending, subject

to the completion of applicable procedure.  As a result of the notice of delisting, the Common Stock is currently trading on the OTC Pink Marketplace under the symbol "BRSWQ."

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

98.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

99.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

100.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during Defendants' wrongful course of conduct alleged herein.

101.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

102.     Bristow's website lists Defendant Miller as a Company officer and as a director. However, in the provided biography, Defendant Miller is not described as a Bristow director and he is not listed as a director in any Form DEF 14A.  Therefore, upon information and belief, Defendant Miller is not included as a director of Bristow at this time.

103.     The Company Board is currently comprised of seven (7) members – Amonett, Banister, Godden, Gobillot, Higgins, Knudson, and Porter.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

104.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

105.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

106.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

107.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT

### Defendants Porter, Godden, Higgins, King and Knudson

108.    Bristow's Audit Committee is presently comprised of Defendants Porter, Godden, Higgins, and Knudson.

109.    Defendant King was a member of the Audit Committee until his retirement from the Bristow Board of Directors, effective February 18, 2019.  As stated in relevant part in Bristow's Form 8-K filed with the SEC of February 20, 2019:

> As previously disclosed, effective February 18, 2019, Stephen A. King resigned from the Board of Directors (the "Board") of the Company. As a result of Mr. King's resignation, the Audit Committee of the Board was temporarily comprised of two directors, each of whom are independent under the NYSE listing standards. As a result of Mr. King's resignation, the Company was temporarily deficient of the requirement under Section 303A.07(a) of the NYSE Listed Company Manual that requires audit committees to be comprised of at least three independent directors. On February 20, 2019, the Company notified the NYSE that the Company was temporarily deficient in meeting this requirement of the NYSE Listed Company Manual.

110.    Defendant Knudson was appointed as a member of the Audit Committee and replaced Defendant King, effective February 20, 2019.

111.    The Director Defendants who served on the Audit Committee are not disinterested and independent.  Pursuant to the Company's Audit Committee Charter, the purposes of the Committee are to assist the Board in fulfilling its oversight responsibilities related to: (i) the integrity of the Company's financial statements; (ii) the Company's internal accounting and financial reporting controls; (iii) the adequacy of and compliance with the Company's disclosure controls and procedures; (iv) the Company's compliance with legal and regulatory requirements; (iv) the Company's risk assessment and risk management regarding financial reporting and legal compliance; (v) the registered public accounting firm's qualifications and independence; and (vi) the performance of the registered public accounting firm.

112.    Defendants Porter, Godden, Higgins, King and Knudson, as members of the Audit Committee, during the time each of them served, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise,

failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies discussed herein.  Thus, these Defendants also face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Amonett, Banister, Gobillot, Masters, Gompert, and Stover**

113.    Bristow's Compensation Committee is presently comprised of Defendants Amonett, Banister, and Gobillot.

114.    Defendant Masters was a member of the Compensation Committee until his retirement from the Bristow Board of Directors, effective July 31, 2018.

115.    Defendants Gompert and Stover were members of the Compensation Committee until their resignations from the Bristow Board of Directors, effective March 1, 2018.

116.    Pursuant to the Compensation Committee's Charter, the purposes of the Committee are to discharge the Board's responsibilities relating to compensation of the Company's directors, the Company's CEO, and all of the Company's other executive officers and for evaluating the director and executive officer compensation plans, policies and programs of the Company and in the case of executive officers, approving such plans, policies and programs.

117.    Defendants Amonett, Banister, Gobillot, Masters, Gompert, and Stover, as members of the Compensation Committee, during the time that each of them served, breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, failed to consider, apply and/or implement Bristow's purported Clawback policies as described in its Corporate Governance Guidelines.  Additionally, the Compensation Committee failed to consider the wrongful conduct as alleged herein when it promoted and approved Bristow's revision of its incentive compensation plans and retention awards to certain executives and the Retirement and Consulting Agreement as alleged herein.

118.    Based on the foregoing and for other reasons as alleged herein, these Defendants also face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**All Director Defendants**

119.    Bristow's Code of Business Integrity (COBI) requires that all officers, directors and employees keep honest and accurate records.  Bristow's COBI states and requires:

> You should never hide, alter, falsify, or disguise the true nature of any business transaction.

> * * *

> Bristow files periodic reports and other documents with various regulatory authorities, including the U.S. Securities and Exchange Commission (SEC) and the New York Stock Exchange. Employees involved in the preparation and submission of these reports and other public disclosure must ensure that the information presented is full, fair, accurate, timely, and understandable.

> * * *

> You should never structure or record any transaction, asset, liability, or reimbursement request, or engage in any other conduct, in an attempt to circumvent Bristow's system of internal controls.

> For more information, see our Code of Ethics for Senior Financial Officers.

> * * *

> Information conveyed in any communication should be accurate, truthful, and never misleading.

120.    The Director Defendants and each of them failed to comply with Bristow's COBI by authorizing and/or permitting the inaccurate disclosures as alleged herein.

121.    Based on the foregoing and for other reasons as alleged herein, these Defendants also face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duties

122.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

123.    Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

124.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

125.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by failing to have adequate monitoring control processes in place related to non-financial covenants within certain of its secured financing and lease agreements and allowing the Company to improperly misrepresent the Company's publicly reported financials and adequacy of its internal controls.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

126.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

127.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits,

severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

128.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

129.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

130.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

131.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

132.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Director Defendants for Gross Mismanagement

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

135.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

136.    Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### Against Defendants for Unjust Enrichment

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Bristow in the form of salaries, bonuses, and other forms of compensation.

139.    Plaintiff, as a stockholder and representative of Bristow, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## FIFTH CAUSE OF ACTION

### Against the Director Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    During the relevant period, Defendants disseminated or approved public statements that failed to disclose the truth about the Company's business and corporate affairs as set forth above, and thus the Company's public statements were materially false and/or misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

142.    As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of

the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable

Dated: June 7, 2019

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (No. 4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com